IN THE SUPREME COURT OF TEXAS
 
════════════
No. 06-0714
════════════
 
Barbara Robinson, Individually 
and as Representative of the
Estate of John Robinson, 
Deceased, Petitioner,
 
v.
 
Crown Cork & Seal Co., 
Inc., Individually and as Successor
to Mundet Cork Corporation, Respondent
 
════════════════════════════════════════════════════
On Petition for Review from 
the
Court of Appeals for the Fourteenth District of 
Texas
════════════════════════════════════════════════════
 
 
Argued February 7, 
2008
 
 
            
Justice Hecht delivered the 
opinion of the Court, in which Chief 
Justice Jefferson, Justice Medina, Justice Green, Justice Willett, and 
Justice Lehrmann joined.
 
            
Justice Medina filed a 
concurring opinion.
 
            
Justice Willett filed a 
concurring opinion, in which Justice 
Lehrmann joined.
 
            
Justice Wainwright filed a 
dissenting opinion, in which Justice 
Johnson joined.
 
            
Justice Guzman did not 
participate in the decision.
 
 
            
The issue we address in this case is whether a statute that limits 
certain corporations’ successor liability for personal injury claims of asbestos 
exposure violates the prohibition against retroactive laws contained in article 
I, section 16 of the Texas Constitution[1] as applied to a pending action. We hold 
that it does, and therefore reverse the judgment of the court of appeals[2] and remand the case to the trial 
court.
I
            
In 2002, petitioner Barbara Robinson (“Robinson”) and her husband, John, 
Texas residents, filed suit alleging that John, age 63, had contracted mesothelioma from workplace exposure to asbestos products. 
As often happens, John had used several such products over the course of his 
life, and the Robinsons sued twenty-one defendants, including respondent Crown 
Cork & Seal Co., alleging that they were all jointly and severally liable. 
With respect to Crown, the Robinsons claimed that during John’s service in the 
United States Navy from 1956 to 1976, he worked with asbestos insulation 
manufactured by the Mundet Cork Corporation, and that 
when Crown and Mundet merged, Crown succeeded to Mundet’s liabilities.
            
Crown has never itself engaged in the manufacture or sale of asbestos 
products.[3] It manufactures metal bottle-caps, known 
in the industry as “crowns”, and other packaging for consumer goods. Crown and 
its affiliates have over 20,000 employees around the world, about 1,000 of whom work in Texas at facilities in Conroe, Sugar Land, and 
Abilene. In 2009, the parent company reported $1.193 billion gross profit on 
$7.938 billion net sales.[4]
            
In November 1963, Crown’s predecessor, a New York corporation with the 
same name, which was then the nation’s largest manufacturer of crowns, acquired 
a majority of the stock in Mundet, another New York 
corporation, which besides insulation, also manufactured crowns. Within ninety 
days, in February 1964, Mundet sold all its assets 
related to its insulation business. Two years later, in February 1966, the 
companies merged. In 1989, Crown’s predecessor was reincorporated as Crown, a 
Pennsylvania corporation.
            
Crown acknowledges that under New York and Pennsylvania law, it succeeded 
to Mundet’s liabilities, which, as pertaining to Mundet’s asbestos business, have been hefty. Over the years, 
Crown has been named in thousands of lawsuits claiming damages from exposure to 
asbestos manufactured by Mundet. While Crown acquired 
Mundet for only about $7 million, by May 2003 Crown 
had paid over $413 million in settlements, and Crown’s parent company estimated 
in its 2003 Annual Report that payments could reach $239 million more.[5] Mundet’s 
aggregate insurance coverage totaled $3.683 million.[6]
            
At first, Crown did not contest its successor liability to the Robinsons 
for any compensatory damages; consequently, the trial court granted the 
Robinsons’ motion for partial summary judgment on that issue. But about the same 
time, the Texas Legislature enacted Chapter 149 of the Texas Civil Practice and 
Remedies Code, which limits certain corporations’ successor liability for 
asbestos claims.[7] Chapter 149 applies (with exceptions not 
relevant here) to “a domestic corporation or a foreign corporation that has 
. . . done business in this state and that is a successor which became 
a successor prior to May 13, 1968”[8] — a date by which, the Legislature 
appears to have thought, the dangers of asbestos should have been commonly 
known.[9] For a covered corporation (again with 
some exceptions not relevant here), “the cumulative successor asbestos-related 
liabilities . . . are limited to the fair market value of the total 
gross assets of the transferor determined as of the time of the merger or 
consolidation”,[10] including “the aggregate coverage under 
any applicable liability insurance that was issued to the transferor 
. . . collectable to cover successor asbestos-related 
liabilities”.[11] This cap does not apply to a successor 
that continued in the asbestos business after the consolidation or 
merger.[12] By restricting application of the cap to 
a corporation that had never engaged in selling asbestos products itself and had 
succeeded to another’s liability for asbestos claims at a time when the extent 
of that liability was not fully appreciated, the supporters of Chapter 149 
intended to protect only what they called the “innocent successor”.
            
Chapter 149 contains a choice-of-law provision, making it applicable, “to 
the fullest extent permissible under the United States Constitution, . . . to the issue of successor asbestos-related 
liabilities” in Texas courts.[13] Furthermore, the Legislature made 
Chapter 149 applicable to all actions:
 
(1) commenced on or after the 
effective date of this Act; or
 
(2) pending on that effective date 
and in which the trial, or any new trial or retrial following motion, appeal, or 
otherwise, begins on or after that effective date.[14]
 
Because the 
Act of which Chapter 149 was part, House Bill 4, passed by more than a 
two-thirds vote in both the House and Senate,[15] it took effect immediately on approval 
by the Governor,[16] which occurred on June 11, 2003.
            
House Bill 4 was massive tort reform legislation, of which Chapter 
149 was a very small piece — two pages of a 52-page bill.[17] Chapter 149 was not included in the bill 
as filed but was added when the bill came to the House floor by an amendment 
offered by the bill’s sponsor. When asked which manufacturers “in particular” 
would be protected, the sponsor replied that he was “advised that there’s one in 
Texas, Crown Cork and Seal”.[18] Although House debate on the whole bill 
took days, debate on Chapter 149 lasted just over an hour.[19] Four unfriendly amendments,[20] one of which would have made Chapter 149 
inapplicable to “successor asbestos-related liabilities that were assumed or 
incurred before [its] effective date”,[21] all failed by wide margins. In the 
Senate, Chapter 149 was significantly revised but drew only one brief comment in 
that chamber, this observation by the committee chair as hearings commenced: 
“This, members, is the Crown Cork and Seal asbestos issue. What we have put in 
this bill is what I understand to be an agreed arrangement between all of the 
parties in this matter.”[22]
            
No legislative findings or statement of purpose accompanied Chapter 149. 
But after the conference committee report on House Bill 4 was adopted in 
the House, the sponsor inserted a “statement of legislative intent” in the House 
Journal, which did not mention Crown and explained the policy basis for Chapter 
149 as follows:
 
A corporation is currently liable up to its total value for 
all injuries it causes. If that corporation merges with a much larger 
corporation, however, the successor corporation is liable for the injuries 
caused by its predecessor (even though not caused in any way by the successor) 
up to the successor’s much higher value. In the case of long-tailed and unknown 
asbestos-related liabilities, a much larger successor can easily be bankrupted 
by the asbestos-related liabilities it innocently received from a much smaller 
predecessor with which it merged [many] decades ago.
 
To eliminate that unfairness — and even to save successor 
corporations from bankruptcy — some have proposed a new rule limiting liability 
especially for asbestos-related successor liabilities acquired solely through a 
merger. The successor would be liable only up to the entire gross asset value of 
the predecessor from whom it received the asbestos-related liabilities.[23]
 
The statement 
described Chapter 149 as a “new concept” that was being tested “by taking one 
step at a time and providing realistic relief to those innocent successor 
corporations most at peril financially without limiting every type of asbestos 
liability.”[24] According to the statement, Chapter 
149’s restrictions had been crafted to ensure that “the benefits of this 
legislation should be limited . . . to those successor corporations 
who were the most innocent about the potential hazards of asbestos” and “were 
also at the greatest financial peril, especially those threatened with 
bankruptcy”.[25]
            
Crown promptly moved for summary judgment under the new law, requesting 
that the prior order establishing its successor liability to the Robinsons be 
vacated and that their claims for asbestos exposure be dismissed. Crown asserted 
that the summary judgment evidence established that its merger with Mundet occurred before May 13, 1968, that it had never 
engaged in Mundet’s insulation business, and that its 
successor asbestos-related liabilities, already more than $413 million, greatly 
exceeded the fair market value of Mundet’s total gross 
assets determined as required by the statute[26] — about $15 million in 1966 (some $57 
million in 2003 dollars). Thus, Crown contended, Chapter 149 barred the 
Robinsons from recovering on their claims. In response, the Robinsons argued 
that the record did not establish the applicability of Chapter 149,[2][7] or if it did, the statute violated 
several provisions of the Texas Constitution.[28]
            
The trial court granted Crown’s motion. Days later, John Robinson 
died.[29] Barbara Robinson amended her petition to 
assert statutory wrongful death[30] and survival actions[31] against Crown and the other defendants 
still remaining in the case. (Several defendants had settled for amounts 
totaling $859,067 and been dismissed.) Without addressing these statutory 
actions, Crown moved to sever the summary judgment to make it final and 
appealable,[3][2] and the trial court granted the motion. 
The court also stayed proceedings in Robinson’s case against the other 
defendants.
            
On appeal, Robinson contends that Chapter 149 is a retroactive law 
prohibited by article I, section 16 of the Texas Constitution. The law is 
well-settled, she asserts, that the Legislature has no authority to extinguish 
vested rights, and that her accrued cause of action against Crown is a vested 
right. A majority of the court of appeals did not “find the law on vested rights 
to be as consistent and lucid as Mrs. Robinson claims”[33] and concluded that it provides “no clear 
answer” to whether Chapter 149 is an invalid retroactive law.[34] Relying on this Court’s decision in 
Barshop v. Medina County Underground Water 
Conservation District,[35] the court decided that whether a law is 
unconstitutionally retroactive depends not on whether it infringes upon a vested 
right but on whether it is a “‘valid exercise of the police power by the 
Legislature to safeguard the public safety and welfare’”.[36] Whether an exercise of the police power 
is valid, the court of appeals determined, depends on
 
(1) whether the act is appropriate 
and reasonably necessary to accomplish a purpose within the scope of the police 
power, and (2) whether the ordinance is reasonable by not being arbitrary and 
unjust or whether the effect on individuals is unduly harsh so that it is out of 
proportion to the end sought to be accomplished.[37]
 
            
The court found that “the purpose for which [Chapter 149] was enacted — 
the financial viability of the State and businesses in the State — is a valid 
exercise of police power.”[38] The court further found that the 
restrictions in the statute left “the pool of potential defendants as large as 
possible for claimants having valid claims for damages resulting from asbestos 
products”,[39] thereby limiting the “detrimental impact 
on plaintiffs such as the Robinson so that [it] was not out of proportion to the 
end sought”.[40] Concluding that deference must be given 
to the Legislature in the exercise of its police power, the court held that 
Chapter 149 is not unconstitutionally retroactive because it is “(1) within the 
Legislature’s police power and (2) narrowly tailored (a) to protect the most 
innocent corporations hard hit by asbestos litigation but (b) to leave the 
potential pool of asbestos defendants as large as possible.”[41] Accordingly, 
the court affirmed the summary judgment.[42]
            
The dissent disagreed with the majority’s approach to assessing 
unconstitutionality. It argued that “the Legislature has no police power to 
enact retroactive laws in violation of section 16”, even if reasonably 
exercised.[43] Barshop 
notwithstanding, the dissent insisted, “the weight of precedent . . . 
requires the use of the vested-rights analysis.”[44] The dissent contended that “an accrued 
cause of action is a vested right”,[45] rejecting some caselaw that “an accrued claim is not vested until it is 
reduced to a judgment final by appeal”.[46] Thus, the dissent reasoned, “[b]ecause Mrs. Robinson’s claims accrued and were pending in 
the trial court when [Chapter 149] took effect, Mrs. Robinson held vested rights 
in these claims that could not be destroyed”,[47] irrespective of the fact that Chapter 
149 “does not bar all of Mrs. Robinson’s remedy for the claimed injuries because 
she can sue other companies not protected”.[48] Without assessing the reasonableness of 
the Legislature’s action, the dissent concluded that Chapter 149 is 
unconstitutionally retroactive because the “Legislature created a new 
substantive defense to successor liability and made it immediately effective in 
all pending cases, destroying Mrs. Robinson’s vested rights in her accrued tort 
claims against Crown”.[49]
            
We granted Robinson’s petition for review.[50] Another court 
of appeals, also divided, has since reached the opposite result from the court 
of appeals in this case.[51]
II
            
As a threshold matter, it is important to note the precise issue before 
us. The Robinsons’ pleading on which Crown moved for summary judgment asserted 
common-law causes of action for negligence and strict liability, and claimed 
compensatory and punitive damages.[52] For herself, 
Barbara claimed damages for John’s medical expenses that she had incurred, as 
well as her loss of consortium and mental anguish, and punitive damages. Had 
John lived, the summary judgment would have disposed of all 
the Robinsons’ claims against Crown.
            
But John died a few days after summary judgment was granted, and Robinson 
amended her petition to add statutory wrongful death and survival actions. The 
record does not reflect that Crown moved for summary judgment on Robinson’s 
statutory claims, or that the trial court ever disposed of them specifically. 
The trial court and parties appear to have assumed, correctly, that the summary 
judgment was nevertheless final because Robinson’s statutory claims are wholly 
derivative of John’s common-law claims, and the adjudication of the latter 
effectively disposed of the former.[53]
            
But even though the summary judgment was final, an analysis of the 
retroactive effect of Chapter 149 on common-law claims and statutory claims 
presents different considerations. As we discuss more fully below, Crown argues 
that in determining whether the constitutional prohibition against retroactive 
laws applies in this case, it is significant that successor liability is a 
creature of statute. The same argument could be made to Robinson’s wrongful 
death and survival claims, though not to the common-law claims the Robinsons 
previously asserted. Also, Robinson argues that it is important for our 
constitutional analysis that the common-law claims barred by Chapter 149 had 
both accrued and were the subject of a pending lawsuit before the statute was 
enacted. But neither is true of her statutory claims.
            
The parties have not briefed — or even mentioned — any of these issues 
but have confined their arguments regarding whether Chapter 149 is an 
unconstitutionality retroactive law as applied to the common-law claims the 
Robinsons asserted before John’s death, which were adjudicated by summary 
judgment. These arguments are the only ones we address. We intimate no view on 
whether Chapter 149 limits Robinson’s statutory wrongful death and survival 
claims except insofar as they are derivative of the claims specifically 
adjudicated by the trial court.
III
            
Before we can decide whether Chapter 149 is unconstitutionally 
retroactive, we must first resolve the parties’ dispute over the proper 
standards to be applied in making that determination. Robinson, like the 
dissenting opinion in the court of appeals, argues that the test is simply 
whether vested rights have been impaired, period; if so, the law is prohibited, 
regardless of the Legislature’s reasons for enacting it. Crown counters that the 
majority opinion in the court of appeals was correct in focusing instead on the 
reasonableness of the Legislature’s exercise of its police power; the 
prohibition against retroactive laws does not invalidate a proper exercise of 
that power despite its impairment of private rights.[54] As each position finds support in our 
case law, we begin by returning to first principles. We conclude that the 
history and purpose of the constitutional provision require a fuller statement 
of its proper application than we have previously given.
A
            
There exists in this country, as the United States Supreme Court observed 
in Landgraf v. USI Film Products, a 
“presumption against retroactive legislation [that] is deeply rooted in our 
jurisprudence[] and embodies a legal doctrine centuries older than our Republic. 
. . . [T]he ‘principle that the legal effect of conduct should 
ordinarily be assessed under the law that existed when the conduct took place 
has timeless and universal human appeal.’”[55] In a concurring 
opinion in an earlier case, Justice Scalia noted that this principle
 
was 
recognized by the Greeks, by the Romans, by English common law, and by the Code 
Napoleon. It has long been a solid foundation of American law. . . . 
Justice Story said that “retrospective laws are 
. . . generally unjust; and . . . neither accord with 
sound legislation nor with the fundamental principles of the social 
compact.”[56]
 
            
The United States Constitution does not expressly prohibit retroactive 
laws, but “the antiretroactivity principle finds 
expression” in its prohibitions of bills of attainder, ex post facto laws, and 
state laws impairing the obligation of contracts.[57] The thrust of 
each is easily stated:
 
The Ex Post Facto Clause flatly prohibits retroactive 
application of penal legislation. . . . States [are prohibited] from 
passing another type of retroactive legislation, laws “impairing the Obligation 
of Contracts.” . . . The 
prohibitions on “Bills of Attainder” in Art. 1 §§ 9-10, prohibit 
legislatures from singling out disfavored persons and meting out summary 
punishment for past conduct.[58]
 
But the 
application of each prohibition must be measured by the object to be obtained. 
Thus, while the bill of attainder originated as an English parliamentary act 
sentencing to death someone who had attempted to overthrow the government,[5][9]
 
the 
proper scope of the Bill of Attainder Clause, and its relevance to contemporary 
problems, must ultimately be sought by attempting to discern the reasons for its 
inclusion in the Constitution, and the evils it was designed to eliminate. The 
. . . Bill of Attainder Clause was intended not as a narrow, technical 
(and therefore soon to be outmoded) prohibition, but rather as an implementation 
of the separation of powers, a general safeguard against legislative exercise of 
the judicial function, or more simply — trial by legislature.[60]
 
With respect 
to ex post facto laws:
 
The prohibition, in the letter, is not to pass any law 
concerning, and after the fact; but the plain and obvious meaning and intention 
of the prohibition is this; that the Legislatures of the several states, shall 
not pass laws, after a fact done by a subject, or citizen, which shall have 
relation to such fact, and shall punish him for having done it.[61]
 
And as for the 
prohibition against laws impairing contract obligations, Chief Justice Marshall 
observed:
 
Taken in its broad, unlimited sense, the clause would be an 
unprofitable and vexatious interference with the internal concerns of a State, 
would unnecessarily and unwisely embarrass its legislation, and render immutable 
those civil institutions, which are established for purposes of internal 
government, and which, to subserve those purposes, 
ought to vary with varying circumstances. That as the framers of the 
constitution could never have intended to insert in that instrument, a provision 
so unnecessary, so mischievous, and so repugnant to its general spirit, the term 
“contract” must be understood in a more limited sense. That it must be 
understood as intended to guard against a power of at least doubtful utility, 
the abuse of which had been extensively felt; and to restrain the legislature in 
future from violating the right to property. That anterior to the formation of 
the constitution, a course of legislation had prevailed in many, if not in all, 
of the States, which weakened the confidence of man in man, and embarrassed all 
transactions between individuals, by dispensing with a faithful performance of 
engagements. To correct this mischief, by restraining the power which produced 
it, the State legislatures were forbidden “to pass any law impairing the 
obligation of contracts,” that is, of contracts respecting property, under which 
some individual could claim a right to something beneficial to himself; and 
that, since the clause in the constitution must in construction receive some 
limitation, it may be confined, and ought to be confined, to cases of this 
description; to cases within the mischief it was intended to 
remedy.[62]
 
            
Texas Constitutions have contained these provisions as well as a general 
prohibition against retroactive or retrospective laws.[63] This prohibition against retroactive 
laws, like other constitutional bars, must be governed by its purpose, for 
“retroactive” simply means “[e]xtending in scope or 
effect to matters which have occurred in the past; retrospective”,[64] and “retrospective”, even more simply, 
means “[d]irected to, contemplative of, past 
time”.[65] In our first case construing the 
retroactivity clause, DeCordova v. City of 
Galveston, Chief Justice Hemphill cautioned that applying this prohibition 
without regard to the objects to be achieved would have
 
a latitude of signification, which would embarrass legislation 
on existing or past rights and matters, to such an extent as to create 
inextricable difficulties, and, in fact, to demonstrate that it was incapable of 
practical application. A retrospective law literally means a law which looks 
backwards, or on things that are past; or if it be taken to be the same as 
retroactive, it means to act on things that are past. If it be understood in its 
literal meaning, without regard to the intent, then all laws, having an effect 
on past transactions or matters, or by which the slightest modification may be 
made of the remedy for the recovery of rights accrued, or the redress of wrongs 
done, are prohibited equally with those which divest rights, impair the 
obligation of a contract, or make an act, innocent at the time it was done, 
subsequently punishable as an offence.[66]
 
The 
constitutional prohibition was not intended to operate so indiscriminately. 
“Mere retroactivity is not sufficient to invalidate a statute. . . . 
Most statutes operate to change existing conditions, and it is not every 
retroactive law that is unconstitutional.”[67]
            
The presumption against retroactivity has two fundamental objectives 
identified by the Supreme Court in Landgraf. 
First, it protects the people’s reasonable, settled expectations.
 
Elementary considerations of fairness dictate that individuals 
should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations 
should not be lightly disrupted. . . . In a free, dynamic society, creativity in 
both commercial and artistic endeavors is fostered by a rule of law that gives 
people confidence about the legal consequences of their actions.[68]
 
In other 
words, the rules should not change after the game has been played. Second, the 
presumption against retroactivity protects against abuses of legislative 
power.
 
The Legislature’s unmatched powers allow it to sweep away 
settled expectations suddenly and without individualized consideration. Its 
responsivity to political pressures poses a risk that 
it may be tempted to use retroactive legislation as a means of retribution 
against unpopular groups or individuals.[69]
 
As James 
Madison argued, “retroactive legislation also offer[s] 
special opportunities for the powerful to obtain special and improper 
legislative benefits.”[70]
            
Still, not all retroactive legislation is bad. Landgraf also notes:
 
Retroactivity provisions often serve entirely benign and 
legitimate purposes, whether to respond to emergencies, to correct mistakes, to 
prevent circumvention of a new statute in the interval immediately preceding its 
passage, or simply to give comprehensive effect to a new law Congress considers 
salutary.[71]
 
Constitutional 
provisions limiting retroactive legislation must therefore be applied to achieve 
their intended objectives — protecting settled expectations and preventing abuse 
of legislative power.
B
            
In DeCordova, Chief Justice Hemphill 
wrote that “[l]aws are deemed retrospective and within 
the constitutional prohibition, which by retrospective operation, destroy or 
impair, vested rights”.[72] For this formulation of the prohibition, 
he, like many judges since, cited Justice Story’s statement in Society for 
the Propagation of the Gospel v. Wheeler, applying the New Hampshire 
constitution’s prohibition against retroactive laws:
 
[E]very statute, which takes away or impairs vested rights 
acquired under existing laws, or creates a new obligation, imposes a new duty, 
or attaches a new disability, in respect to transactions or considerations 
already past, must be deemed retrospective . . . .[73]
 
But as both 
cases explained, “impairs vested rights” has special meaning. “[A] statute 
merely regulating a remedy,” Justice Story added, “and prescribing the mode and 
time of proceeding” does not impair vested rights.[74] Chief Justice Hemphill agreed,
 
unless 
the remedy be taken away altogether, or encumbered with conditions that would 
render it useless or impracticable to pursue it. Or, if the provisions 
regulating the remedy, be so unreasonable as to amount to a denial of right, as, 
for instance, if a statute of limitations, applied to existing causes, barred 
all remedy or did not afford a reasonable period for their prosecution; or if an 
attempt were made by law, either by implication or expressly, to revive causes 
of action already barred; such legislation would be retrospective within the 
intent of the prohibition, and would therefore be wholly 
inoperative.[75]
 
In other 
words, in applying the prohibition against retroactivity, a law that impairs a 
remedy does not impair a right, except sometimes. On further reflection, this 
Court conceded more than a century later: “Remedies are the life of rights. 
While our precedents recognize and apply the distinction [between a remedy and a 
right], they also recognize that the two terms are often inseparable.”[76]
            
The obscurity in the right/remedy distinction typifies the problems in 
using “impairs vested rights” as a test for unconstitutional retroactivity, as 
our cases illustrate. In DeCordova, we held 
that a statute of limitations on suits for debt enacted after the defendant 
executed notes payable to the plaintiff but before they matured merely limited 
the plaintiff’s collection remedy and therefore was not unconstitutionally 
retroactive.[77] The idea that the debt had not been 
extinguished, only the means of collection, might be viewed by most creditors as 
a distinction without a difference. But the Court reasoned that the absence of a 
statute of limitations when the notes were executed did not give the plaintiff a 
vested right to sue forever. In Texas Water Rights Commission v. Wright, 
we upheld a statute authorizing forfeiture of a water permit after ten years of 
non-use, concluding that permit holders could reasonably expect enforcement of 
the “conditions inherently attached” to their permit, and that a permit included 
no right to be forever free of a remedy to enforce those conditions.[78] Moreover, a retroactive use requirement 
was valid for the State “to assert and protect its own rights and interests in 
the water.”[79] In City of Tyler v. Likes, we 
held that a statute reclassifying a city’s proprietary functions as 
governmental, thereby limiting liability, affected only a remedy, not a right, 
even though a claimant would recover less or perhaps not at all.[80] And in In re A.D., we held that a statute removing 
the limitations period for enforcing child support decrees by ordering 
withholding of wages affected only a remedy, even though it expanded enforcement 
of the debt.[81]
            
In each of these cases, significant interests were adversely impacted by 
changes in the law, yet the Court held that vested rights were not impaired. The 
results of the cases seem entirely reasonable in a very general sense, although 
the claimants in the cases doubtless had a different view, but it is not clear 
how they were driven by a concern for protecting vested rights. In a recent 
case, Owens Corning v. Carter, we did not mention the right/remedy 
distinction in upholding a law that required application of the statute of 
limitations of the plaintiff’s state of residence, even though doing so barred 
pending actions in Texas courts.[82] We simply held that for a plaintiff who 
has not sued within the time permitted by the state in which he resides and in 
which the cause of action arose, barring suit in Texas “is not 
inequitable”.[83] Nevertheless, the plaintiff in a pending 
case had a viable claim that the change in the law extinguished.
            
In three of these five cases, DeCordova, 
Wright, and Likes, it was important that, as it happened, the 
people involved had ample opportunity after the change in the law to protect 
their interests: four years to sue in DeCordova,[84] seven years to resume pumping water in 
Wright,[85] and two months to sue in 
Likes.[86] But in the other two cases, A.D. 
and Owens Corning, the persons affected by changes in the law had no time 
to respond. We have since held that a change in the law need not provide a grace 
period to prevent an impairment of vested rights.[87]
            
“Statutes of limitations are procedural”,[8][8] but sometimes a change may impair vested 
rights. In 1887, we stated in Mellinger v. City of Houston that when a law 
“shall operate in favor of a defendant as a defense against a claim made against 
him, then it must be said that a right exists, has become fixed or vested, and 
is beyond the reach of retroactive legislation”.[89] Thus, we said, a law extending a 
limitations period so as to resurrect barred claims would be unconstitutionally 
retroactive. But only two years earlier the United States Supreme Court had held 
in Campbell v. Holt that just such a law reviving claims did not offend 
due process under the United States Constitution because “no right is destroyed 
when the law restores a remedy which had been lost.”[90] Campbell arose out of Texas, and 
the Supreme Court cited this Court’s 1870 decision in Bender v. 
Crawford,[91] which held that a retroactive suspension 
of limitations statutes during the aftermath of the Civil War was not a 
prohibited retroactive law, even though claims that would have been barred were 
not.[92] Mellinger cited Campbell, and “not wish[ing] to be understood as questioning its correctness”, 
distinguished the due process guarantees in the state and federal constitutions 
from the prohibition of retroactive laws.[93] But while due process and antiretroactivity may protect vested rights differently, 
Mellinger did not explain why a limitations bar 
is a vested right in one context but not in the other. In other words, a law 
that is prohibitively retroactive might not also offend due process, but not 
because a vested right for one is not a vested right for the other. Nor did 
Mellinger cite Bender.
            
A generation later, we held in Wilson v. Work that “it is the 
settled law that, after a cause has become barred by the statute of limitation, 
the defendant has a vested right to rely on such statute as a defense.”[94] We repeated that view more recently in 
Baker Hughes, Inc. v. Keco R. & D., 
Inc.[95] The earlier confusion may be 
attributable to the time in which the issues arose. Bender offered this 
insight:
 
[T]hey who talk about vested rights in the bar of limitations 
should at least remember the times in which we have been living; and those who 
think our constitution is not republican, nor in accordance with the great 
republican conception of our institutions, should remember that from the second 
of March, 1861, to the twenty-ninth of March, 1870, we had no republican 
government in Texas. Four years of that period were one of bloody and 
unrelenting war. From 1865 to 1870 we were a military government; he who gained 
a vested right in the statute of limitations during at least a portion of that 
period, gained it only because inter arma leges silent. Vultures and wolves gain vested rights 
when armies are slaughtered, if these be vested rights.[96]
 
            
Bender dared to speak plainly: there are vested rights and then 
there are vested rights, and not all laws which may fairly be said to 
retroactively impair vested rights are constitutionally prohibited. The problem 
is not confined to the aftermath of the Civil War. Many years ago, one 
commentator lamented:
 
One’s first impulse on undertaking to discuss retroactive laws 
and vested rights is to define a vested right. But when it appears, as soon 
happens, that this is impossible, one decides to fix the attention upon 
retroactive laws and leave the matter of definition to follow rather than 
precede the discussion, assuming for the purpose that a right is vested when it 
is immune to destruction, and that it is not vested when it is liable to 
destruction, by retroactive legislation. The simplification of the task which 
this plan seems to involve, turns out to be something of an illusion, however, 
when it appears, as also soon happens, that one’s preconceived notions of 
retroactive laws are irreconcilable with the data with which one has to 
deal.[97]
 
What 
constitutes an impairment of vested rights is too much in the eye of the 
beholder to serve as a test for unconstitutional retroactivity.
            
This can hardly be more vividly demonstrated than in today’s opinions by 
Justice Wainwright and Justice Medina. The arguments and 
authorities ably marshaled in each show a deep division over whether a 
retroactive restriction on a cause of action impairs vested rights. Of course it 
does, if a claim, no matter how flimsy, is a vested right; or not, if a claim, 
even a strong one, must be reduced to judgment before it becomes a vested right. 
The dispute over whether to call something a vested right appears driven not so 
much by what the words mean as by the consequence of applying the label — that 
its impairment is prohibited. Or as one commentator has put it: “it has long 
been recognized that the term ‘vested right’ is conclusory — a right is vested when it has been so far 
perfected that it cannot be taken away by statute.”[98] The “impairs 
vested rights” test thus comes down to this: a law is unconstitutionally 
retroactive if it takes away what should not be taken away.
C
            
In two cases this Court has held that retroactive laws were not 
constitutionally prohibited, despite their impairment of vested rights, because 
they were each a valid exercise of the Legislature’s police power. The first, 
Barshop v. Medina County Underground Water 
Conservation District,[9][9] involved a facial challenge to the 
Edwards Aquifer Act.[100] Before the Act, withdrawal of 
groundwater from the Aquifer was unrestricted. The Act created an Authority to 
regulate groundwater withdrawals, capped annual withdrawals, required that wells 
be operated under permits, gave preference to existing users, and restricted 
withdrawals under a permit based on the owner’s historic use.[101] The Act operated retroactively in 
basing the right to groundwater on historic use and gave landowners no 
opportunity to preserve their prior right to unlimited water, but we stated that 
“article I, section 16 does not absolutely bar the Legislature from enacting 
such statutes.”[102] Acknowledging that “retroactive laws 
affecting vested rights that are legally recognized or secured are 
invalid”,[103] we nevertheless held that “[a] valid 
exercise of the police power by the Legislature to safeguard the public safety 
and welfare can prevail over a finding that a law is unconstitutionally 
retroactive.”[104] The Legislature had included in the Act 
findings that the Authority was necessary “‘to protect terrestrial and aquatic 
life, domestic and municipal water supplies, the operation of existing 
industries, and the economic development of the state’”[105] and that “the aquifer was ‘vital to the 
general economy and welfare of this state.’”[106] “Based on these legislative findings,” 
we concluded that the Act was “necessary to safeguard the public welfare of the 
citizens of this state” and therefore the Act’s retroactive effect did not 
“render it unconstitutional” on its face.[107]
            
The second case, In re A.V.,[10][8] involved section 161.001 of the Texas 
Family Code, which lists several grounds for terminating parental rights. An 
amendment had added subsection (1)(Q) to the list, thus 
providing for termination when a parent “has knowingly engaged in criminal 
conduct for which the parent is incarcerated and unable to care for the child 
‘for not less than two years from the date of filing the petition’”.[109] The issue was whether the amendment was 
unconstitutionally retroactive as applied to a parent convicted before it was 
enacted. The amendment, we noted, was primarily prospective, focusing on “the 
parent’s future imprisonment and inability to care for the child, not the 
criminal conduct that the parent committed in the past.”[110] But to the extent the amendment had a 
retroactive effect, we held it was not 
unconstitutional. Recognizing that “a parent’s constitutionally-protected 
relationship with his or her children [is] a right that presumably cannot be 
altered through retroactive application of law”,[11][1] we stated, quoting Barshop, that a “‘valid exercise of the police power 
by the Legislature to safeguard the public safety and welfare’ is a recognized 
exception to the unconstitutionality of retroactive laws.”[112] Given the Legislature’s declaration 
that “‘[t]he public policy of this state [is to] provide a safe, stable, and 
nonviolent environment for the child’”, we concluded that public policy 
justified the statute’s retroactive effect.[113] Furthermore, we said, “[a] law that 
does not upset a person’s settled expectations in reasonable reliance upon the 
law is not unconstitutionally retroactive.”[114] In our view, a 
person “could not reasonably expect that the State would not act to provide a 
safe environment for his children while he was imprisoned.”[115]
            
Robinson does not argue that Barshop and 
A.V. were wrongly decided but nevertheless insists that the test for 
unconstitutional retroactivity is not whether a law is a reasonable exercise of 
the Legislature’s police power but whether it impairs vested rights. In her 
view, rights may be “vested for different purposes depending on the 
context”,[116] thereby affecting the constitutional 
provision’s operation, and thus prohibiting retroactive laws limiting liability 
for asbestos claims but not laws preserving groundwater and protecting children. 
Stated differently: the right to sue is protected from 
retroactive impairment while the rights to groundwater or one’s children are 
not. One might view this as backwards, that a parent’s right to a child, 
which is “fundamental”,[117] “‘one of constitutional 
dimensions’”,[118] and “‘far more precious than any 
property right’”,[119] would be more deserving of protection 
from impairment by retroactive laws than a claim of injury that might not even 
result in recovery. But regardless of the three rights’ relative importance, 
Robinson’s argument that they are somehow vested differently for purposes of 
determining unconstitutional retroactivity establishes the fundamental failure 
of the “impairs vested rights” test.
            
We agree with Robinson, however, that Barshop and A.V. do not except a retroactive 
law from the constitutional prohibition merely because there was a rational 
basis for its enactment, or even because, on balance, it is likely to do more 
good than harm. The Legislature found the water-permitting scheme established in 
the Edwards Aquifer Act to be necessary to discharge its constitutional duty to 
conserve groundwater,[12][0] and the necessity of providing for the 
welfare of children of incarcerated convicts is too obvious to require 
justification. But necessity alone cannot justify a retroactive law. The 
retroactive laws in Barshop and A.V. 
were not unconstitutional because they did not defeat the objectives of the 
constitutional prohibition. There can be no settled expectation that a limited 
resource like groundwater, affected by public and private interests, will not 
require allocation, or that a person unable to care for his children has greater 
rights if his inability is due to prolonged incarceration than for other 
reasons. And in both cases, the Legislature acted for the general public 
good.
D
            
We think our cases establish that the constitutional prohibition against 
retroactive laws does not insulate every vested right from impairment, nor does 
it give way to every reasonable exercise of the Legislature’s police power; it 
protects settled expectations that rules are to govern the play and not simply 
the score, and prevents the abuses of legislative power that arise when 
individuals or groups are singled out for special reward or punishment. No 
bright-line test for unconstitutional retroactivity is possible. Rather, in 
determining whether a statute violates the prohibition against retroactive laws 
in article I, section 17 of the Texas Constitution, courts must consider three 
factors in light of the prohibition’s dual objectives: the nature and strength 
of the public interest served by the statute as evidenced by the Legislature’s 
factual findings; the nature of the prior right impaired by the statute; and the 
extent of the impairment.[121] The perceived public advantage of a 
retroactive law is not simply to be balanced against its relatively small impact 
on private interests, or the prohibition would be deprived of most of its force. 
There must be a compelling public interest to overcome the heavy presumption 
against retroactive laws. To be sure, courts must be mindful that statutes are 
not to be set aside lightly. This Court has invalidated statutes as 
prohibitively retroactive in only three cases, all involving extensions of 
statutes of limitations.[122] But courts 
must also be careful to enforce the constitutional prohibition to safeguard its 
objectives.
            
Under this test, changes in the law that merely affect remedies or 
procedure, or that otherwise have little impact on prior rights, are usually not 
unconstitutionally retroactive. But these consequences of the proper application 
of the prohibition cannot substitute for the test itself. The results in all of 
our cases applying the constitutional provision would be the same under this 
test. The cases that considered only whether the challenged statute impaired 
vested rights implicitly concluded that any impairment did not upend settled 
expectations and was overcome by the public interest served by the enactment of 
the statute. And the cases that focused on the propriety of the Legislature’s 
exercise of its police power implicitly concluded that the exercise was not 
merely reasonable but was compelling, notwithstanding the statute’s effect on 
prior rights.
            
The test the court of appeals distilled from the cases focuses too much 
on the reasonableness of legislative action and does not give full voice to the 
concerns addressed by the prohibition against retroactive laws. The court 
believed that one consideration in applying the prohibition is whether a statute 
is “appropriate and reasonably necessary to accomplish a purpose within the 
scope of the police power”.[123] But the necessity and appropriateness 
of legislation are generally not matters the judiciary is able to assess. In 
Barshop, for example, we did not undertake to 
determine whether the regulation scheme fashioned by the Legislature in the 
Edwards Aquifer Act was the only, the best, or even a good way to conserve and 
allocate groundwater among those claiming a right to it. The important 
considerations were that the Act discharged the Legislature’s constitutionally 
mandated duty to conserve public resources, that some regulation was entirely to 
be expected, and that the burden of its retroactive effect in basing future 
withdrawals on historic use was shared by all those claiming a right to 
groundwater.
            
The second factor in the court of appeals’ test was whether a statute is 
unreasonable, arbitrary, unjust, unduly harsh, or disproportionate to the end 
sought to be accomplished.[124] But the intent 
of the prohibition against retroactive laws is to foreclose these kinds of 
considerations to the Legislature in enacting laws and to the judiciary in 
reviewing them. A retroactive law is not permissible merely because the end 
seems to justify the means. The presumption is that a retroactive law is 
unconstitutional without a compelling justification that does not greatly upset 
settled expectations.
            
Robinson would go further. She argues that because the prohibition 
against retroactive laws is part of the Texas Constitution’s Bill of Rights, it 
is absolute, and any weighing of the government’s interest in enacting a 
retroactive law is precluded by article I, section 29 of the Texas Constitution, 
which states:
 
To guard against transgressions of the high powers herein 
delegated, we declare that everything in this “Bill of Rights” is excepted out of the general powers of government, and shall 
forever remain inviolate, and all laws contrary thereto, or to the following 
provisions, shall be void.
 
But Robinson’s 
argument begs the question. We do not disagree that the constitutional 
prohibition is absolute when it applies, as are the right to worship, the right 
to free speech, the freedom from unreasonable search and seizure, the guaranty 
of due course of law, and the other protections of the Bill of Rights. But 
section 29 does not determine whether and how the Bill of Rights’ provisions 
apply. What Justice Oliver Wendell Holmes observed about all rights applies to 
the right to be free from retroactive laws:
 
All rights tend to declare themselves absolute to their 
logical extreme. Yet all in fact are limited by the neighborhood of principles 
of policy which are other than those on which the particular right is founded, 
and which become strong enough to hold their own when a certain point is 
reached. The limits set to property by other public interests present themselves 
as a branch of what is called the police power of the State. The boundary at 
which the conflicting interests balance cannot be determined by any general 
formula in advance, but points in the line . . . are fixed by 
decisions that this or that concrete case falls on the nearer or farther 
side.[125]
 
IV
            
Using the standards we have set out, we must now determine whether 
chapter 149 is unconstitutionally retroactive as applied to Robinson.
A
            
We first consider the nature of the rights claimed by the Robinsons and 
Chapter 149’s impact on them. Chapter 149 does not directly restrict the 
Robinsons’ common law action for personal injuries due to exposure to asbestos 
in the workplace. Rather, it supplants the usual choice-of-law rules for 
determining what state’s successor liability law should apply in asbestos cases 
in Texas by mandating Texas courts to apply Texas law, then for the first time 
prescribes limits on that liability, even if, as here, successor liability arose 
under the law of another state. Crown argues that by allowing for an expansion 
of liability beyond the tortfeasor to include a 
successor by merger, successor liability is largely remedial in nature, and in 
any event, is a creature of statute in which there can be neither right nor 
expectation. Crown cites Dickson v. Navarro County Levee Improvement 
District, where we gave immediate effect to a statute that repealed a 
special, statutory cause of action.[126] Crown analogizes this case to Owens 
Corning, which upheld the change in Texas law to allow a plaintiff no more 
time to sue here than he would have had in his state of residence.[127]
            
But the successor liability in this case is not a creature of Texas law; 
the parties agree that without Chapter 149, New York or Pennsylvania law would 
apply, and that under the law of those states, Crown’s successor liability is 
unquestionable. So this is not a case like Dickson, in which the 
Legislature abolished a cause of action it had itself created; Chapter 149 
limits liability created under other states’ laws. Nor is this a case like 
Owens Corning, in which the Legislature changed the statute of 
limitations so that a nonresident plaintiff would gain no advantage by suing in 
Texas rather than in his home state; Chapter 149 disadvantages Texas residents, 
as well as nonresidents, who sue Crown in Texas rather than New York or 
Pennsylvania. Nevertheless, Crown has a point that choice-of-law rules are 
purely procedural and subject to change, often by courts, but certainly by the 
Legislature if it chooses to do so.
            
However, Chapter 149 extinguishes the Robinsons’ claim and all other such 
claims against Crown in Texas, and while it does so indirectly, extinction was 
the Legislature’s specific intent. An interest in maintaining an established 
common-law cause of action is greater than an interest in choice-of-law rules. 
We have held that an unliquidated personal-injury 
claim was not a property interest under the common law,[12][8] but it is now assignable as other 
property interests.[129] The rights protected by the 
constitutional prohibition against retroactive laws are no more limited to those 
recognized at the time the prohibition was adopted than are the rights protected 
by due course of law. An unliquidated claim may have 
little or no value, as for example when the cause of action has not been 
recognized or the elements of recovery cannot be proved. But here, claims like 
the Robinsons’ have become a mature tort, and recovery is more predictable, 
especially when the injury is mesothelioma, a uniquely 
asbestos-related disease. Discovery taken in the case shows 
that the Robinsons’ claims had a substantial basis in fact. Their right 
to assert them was real and important, and it was firmly vested in the 
Robinsons.
            
Crown argues that when Mundet was still selling 
the asbestos insulation to which John Robinson was exposed in ship boiler rooms, 
the Robinsons could not reasonably have expected Mundet to be able to pay all the claims that would 
eventually arise, or that the company would merge with a deeper pocket like 
Crown. But those are not the expectations the prohibition against retroactive 
laws protects. The Robinsons could well have expected, then as now, that a rule 
of law that permitted their recovery, and many others’ before them, would not be 
changed after they had filed suit to abrogate their claim.
            
Crown argues that the Robinsons have alleged that all the defendants they 
have sued are jointly and severally liable and that they are likely to recover 
all their damages from those who have already settled and the others than 
remain. We refuse to speculate about what might happen. If Crown would otherwise 
be responsible for the Robinsons’ injury, then by insulating Crown, Chapter 149 
either reduces the recovery to which the Robinsons are entitled or requires the 
other defendants to pay Crown’s share. Either way, the statute disturbs settled 
expectations.
            
We therefore conclude that Chapter 149 significantly impacts a 
substantial interest the Robinsons have in a well-recognized common-law cause of 
action.
B
            
We next consider whether Chapter 149 serves the public interest. Crown 
argues that the statute helps alleviate the asbestos litigation crisis that has 
already bankrupted many companies, resulting in lost jobs and a burden on the 
State’s economy. The Legislature has recognized the severity of that crisis in 
another context,[13][0] but it did not do so in enacting House 
Bill 4 and Chapter 149. On the contrary, the legislative record is fairly 
clear that chapter 149 was enacted to help only Crown and no one else. Crown 
itself has been unable to identify to us any other company affected by Chapter 
149. There is evidence that Crown has about 1,000 employees in Texas and about 
the same number of former employees on retirement, and that it operates three 
facilities here. Crown asserts that it continues to be sued on asbestos claims 
in Texas, but the record is silent concerning the number of those claims or the 
amount of Crown’s probable exposure.
            
The Legislature made no findings to justify Chapter 149. Even the 
statement by its principal House sponsor fails to show how the legislation 
serves a substantial public interest. No doubt Texas will benefit from reducing 
the liability of an employer and investor in the State, but the extent of that 
benefit is unclear on this record. And in any event, there is nothing to 
indicate that it rises to the level of the public interest involved in 
Bastrop and A.V.
            
Crown argues that the public interest has been recognized by other 
states’ legislatures in enacting similar legislation. We are aware of ten other 
state legislatures that have enacted laws similar to chapter 149. In one state, 
Pennsylvania, the legislation was fully retroactive,[131] just as chapter 149 is, but the Supreme 
Court of Pennsylvania has held the statute to violate the Open Courts provision 
of the Pennsylvania Constitution.[132] Statutes adopted in three states — 
Florida, Indiana, and Wisconsin — apply to pending actions if trial has not 
commenced.[133] Statutes adopted in three other states 
— North Dakota, Ohio, and Oklahoma — have the same application unless it is 
found to be unconstitutional.[134] South Carolina’s statute applies only 
to actions filed after the statute’s effective date,[135] and Georgia’s applies only to actions 
that accrue after the statute’s effective date.[136] The effect of Mississippi’s statute on 
accrued or pending claims is unclear from the text.[137] Other states’ perception of the public 
interest served by retroactive legislation is at best ambiguous.
            
It is tempting to think that the real burden of Chapter 149 on the 
Robinsons and other plaintiffs in their shoes will be light compared to the 
benefit to Crown, its current and former employees, and the State. The 
Robinsons’ case, and most others like it, involves many defendants and large 
settlements funded from many pockets. The impact of Chapter 149 on individual 
cases may be slight, relative to the cumulative impact on Crown without Chapter 
149. But we think that an important reason for the constitutional prohibition 
against retroactive laws is to preempt this weighing of interests absent 
compelling reasons. Indeed, it is precisely because retroactive rectification of 
perceived injustice seems so reasonable and even necessary, especially when 
there are few to complain, that the constitution prohibits it.
            
Accepting the legislative record as indicating the reasons for its 
actions, we conclude that the public interest served by Chapter 149 is 
slight.
* * *
            
For these reasons, we hold that Chapter 149, as applied to the Robinsons’ 
common-law claims, violated article I, section 16 of the Texas Constitution. The 
court of appeals’ judgment is reversed and the case is remanded to the trial 
court for further proceedings.
 
                                                                        
                                                                                    

                                                            
            
Nathan L. Hecht
                                                                        
Justice
Opinion delivered: October 22, 
2010








[1] Tex. Const. 
art. I, § 16 (“No . . . retroactive law . . . shall be 
made.”).

[2] 251 S.W.3d 520 (Tex. App.–Houston [14th Dist.] 
2006).

[3] 
Robinson argued in the lower courts that Mundet’s asbestos business was still in operation when Crown 
became Mundet’s majority shareholder, and that Crown 
should be held to have operated the business for several weeks before it was 
sold, 251 S.W.3d at 539, but she does not make that argument 
here.

[4] 
Crown Holdings, Inc., 
2009 Annual Report (Form 10-K) iii, 51, 88, 
96, 104 (Mar. 1, 2010) (annual reports are available online at 
http://investors.crowncork.com/phoenix.zhtml?c=85121&p=irol-reports, and 
Form 10-K filings are available at 
http://www.sec.gov/cgi-bin/browse-edgar?CIK=0001219601&action=getcompany).

[5] 
Crown Holdings, Inc., 
2003 Annual Report (Form 10-K) 9, 39 (Mar. 
12, 2004) (the Company estimated that its probable and estimable liability for 
pending and future claims would range between $239 and $406 million). Crown’s 
parent’s 2009 Annual Report estimates future payments through 2019 of $230 
million. Crown 
Holdings, Inc., 2009 Annual Report 13, 23, 64.

[6] 
Prior to 1998, amounts paid to claimants were 
covered by a fund of $80 million resulting from a 1985 settlement with carriers 
insuring Crown Cork through 1976, when Crown Cork became self-insured. Crown Holdings, Inc., 2002 Annual 
Report 15, 34 (Mar. 19, 2003).

[7] 
Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 17.01, 2003 Tex. Gen. Laws 847, 
892-896.

[8] Tex. Civ. Prac. & Rem. Code 
§ 149.002(a). 
“Successor” is defined as “a corporation that assumes or incurs, or has assumed 
or incurred, successor asbestos-related liabilities”, id. 
§ 149.001(4), defined broadly as “any liabilities, whether known or 
unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due, that are related in 
any way to asbestos claims that were assumed or incurred by a corporation as a 
result of or in connection with a merger or consolidation”, id. 
§ 149.001(3). Asbestos claims include any claim for property damage or 
personal injury “wherever or whenever made, for damages, losses, 
indemnification, contribution, or other relief arising out of, based on, or in 
any way related to asbestos”. Id. 
§ 149.001(1).

[9] 
Although there was growing awareness of the 
dangers of exposure to asbestos before the mid-1960s, Dr. Irving J. Selikoff is widely credited with publicizing those dangers 
in his 1965 article, The Occurrence of Pleural Calcification Among Asbestos 
Insulation Workers, 132 Ann. N.Y. 
Acad. of Sci. 351 (1965). On May 13, 1968, the American Conference of 
Governmental Industrial Hygienists reduced the recommended workplace limit for 
asbestos in the air. This was, according to the legislative record, “[t]he 
earliest date after Selikoff’s warnings when even a 
quasi-governmental organization in the United States suggested a tighter 
standard for asbestos in the workplace”. H.J. of Tex., 78th 
Leg., R.S. 6044 (June 1, 2003) (statement of legislative intent by Rep. Nixon on 
amendments concerning successor asbestos-related civil liabilities arising from 
certain mergers) (Journal available at 
http://www.journals.house.state.tx.us/hjrnl/78r/html/home.htm).

[10] Tex. Civ. Prac. & Rem. Code 
§ 149.003(a).

[11] Id. 
§ 149.004(c).

[12] Id. § 
149.002(b)(5) (“The limitations in Section 149.003 shall not apply to 
. . . a successor that, after a merger or consolidation, continued in 
the business of mining asbestos or in the business of selling or distributing 
asbestos fibers or in the business of manufacturing, distributing, removing, or 
installing asbestos-containing products which were the same or substantially the 
same as those products previously manufactured, distributed, removed, or 
installed by the transferor . . . .”).

[13] Id. 
§ 149.006.

[14] Act of June 
2, 2003, 78th Leg., R.S., ch. 204, § 17.02, 2003 
Tex. Gen. Laws 847, 895.

[15] The vote in 
each chamber was well over two-thirds, 114 yeas to 32 
nays in the House, H.J. of Tex., 78th Leg., R.S. 
6041-6042 (June 1, 2003), and 27 yeas to 4 nays in the Senate, S.J. of Tex., 78th Leg., R.S. 5008 (June 
1, 2003).

[16] Tex. Const. 
art. III, § 39 (“No law 
passed by the Legislature, except the general appropriation act, shall take 
effect or go into force until ninety days after the adjournment of the session 
at which it was enacted, unless the Legislature shall, by a vote of two-thirds 
of all the members elected to each House, otherwise direct; said vote to be 
taken by yeas and nays, and entered upon the journals.”). See Mann v. 
Gulf States Utils. Co., 167 S.W.2d 557, 560 (Tex. Civ. App.–Austin 1942, 
writ ref’d) (“[W]here a statute is passed with the 
emergency clause by the required vote when approved by the Governor, it becomes 
effective and immediately operative.”).

[17] Among other 
things, House Bill 4 limited attorney fees in class actions (§ 1.01), 
provided for an offer-of-judgment procedure that could result in the shifting of 
attorney fees and expenses (§ 2.01), created a multidistrict litigation 
panel and provided for the transfer of cases for consolidated and coordinated 
pretrial proceedings (§ 3.02), tightened venue statutes (§§ 3.03-.04), 
provided for joinder of responsible third parties 
(§ 4.04), revamped proportionate responsibility among joint tortfeasors (§§ 4.06-.07), restricted recovery in 
product liability cases (§§ 5.01-.02), limited the amounts required for 
supersedeas bonds (§ 7.02), rewrote statutes 
limiting health care liability claims (§ 10.01), limited the liability of 
volunteer fire fighters, teachers, and other government employees 
(§§ 11.01, 11.05, 15.02-.05, 19.01-.02), and further limited recovery of 
exemplary and noneconomic damages (§§ 13.02-.09). Act of June 2, 2003, 78th 
Leg., R.S., ch. 204, 2003 Tex. Gen. Laws 
847.

[18] Debate on 
Tex. H.B. 4 on the Floor of the House, 78th Leg., R.S. (Mar. 25, 2003) 
(statement of Rep. Joe Nixon) (archived video available at 
http://www.house.state.tx.us/media/chamber/78.htm) (video time 
5:04:24-40).

[19] Id. at 4:52:40 
- 6:09:50.

[20] Amendments 7, 
9, 10, and 11 to Amendment 6 to Committee Substitute for House Bill 4 were 
tabled. H.J. of Tex., 78th Leg., R.S. 818-819 (Mar. 25, 2003) (text of 
amendments available at 
http://www.capitol.state.tx.us/Search/AmendSearchResults.aspx?Leg=78&Sess=R&Bill=HB4&Hse=1&Sen=0&Auth=All&2nd=1&3rd=1&Type=All&Action=All&Dateon=&Srch=simple&All=&Any=&Xact=&Xclude=&Custom=&ID=hlQCrLY8x).

[21] Amendment 9 
to Amendment 6 to Committee Substitute for House Bill 4 (available at 
http://www.capitol.state.tx.us/tlodocs/78R/amendments/pdf/HB00004H29.PDF).

[22] Hearings on 
the Proposed Senate Substitute for H.B. 4 Before the S. Comm. on State Affairs, 
78th Leg., R.S. (Apr. 30, 2003) (Statement of Sen. Bill Ratliff, Chairman, S. 
Comm. on State Affairs) (archived video available at 
http://www.senate.state.tx.us/avarchive/ and 
http://www.senate.state.tx.us/75r/Senate/commit/c570/c570_78.htm) (video time 
19:00- 19:23)).

[23] H.J. of Tex., 78th Leg., R.S. 
6042-6043 (June 1, 2003).

[24] Id. at 
6043.

[25] Id.

[26] See Tex. Civ. Prac. & Rem. 
Code § 149.004.

[27] The Robinsons 
disputed Crown’s valuation of Mundet’s total gross 
assets and, as noted above, Crown’s assertion that Mundet had ceased its insulation business before Crown 
acquired its stock, so that Crown never engaged in that business, even as Mundet’s majority stockholder. Robinson raised the latter 
argument in the court of appeals. 251 S.W.3d at 
539-540. Robinson does not make either argument in this 
Court.

[28] The Robinsons 
argued that Chapter 149 as applied violates Texas Constitution art. I, § 13 
(“All courts shall be open, and every person for an injury done him . . . shall have remedy by due course of 
law.”); art. I, § 16 (“No . . . 
retroactive law, or any law impairing the obligation of contracts, shall be 
made.”); art. I, § 17 (“No person’s property shall be taken . . . without adequate compensation 
. . . .”); art. I, § 19 (“No citizen of this State shall be 
deprived of . . . property . . . 
except by the due course of the law . . . .”); and art. III, 
§ 56 (“The Legislature shall not . . . 
pass any . . . special law . . . .”).

[29] After John 
died, Robinson asserted the additional argument on motion for new trial that 
Chapter 149 violated art. XVI, § 26 of the Texas Constitution (“Every . . . corporation . . . that may 
commit a homicide, through wilful act, or omission, or 
gross neglect, shall be responsible, in exemplary damages, to the surviving 
. . . widow . . . .”).

[30] See Tex. Civ. Prac. & Rem. 
Code §§ 71.002, 
71.009.

[31] See id. 
§ 71.021.

[32] The Robinsons 
had asserted claims against Crown that were not disposed of by the summary 
judgment, but they were later nonsuited and 
dismissed.

[33] 251 S.W.3d 520, 526 (Tex. App.–Houston [14th Dist.] 
2006).

[34] Id. at 
527.

[35] 925 S.W.2d 618 (Tex. 1996).

[36] 251 S.W.3d at 523 (quoting Barshop, 925 S.W.2d at 
633-634).

[37] 
Id. at 532.

[38] Id.

[39] Id. at 
532-533.

[40] Id. at 
532.

[41] Id. at 
533.

[42] 251 S.W.3d at 541. The court rejected Robinson’s other two arguments, that 
Chapter 149 is a special law prohibited by article III, section 56 of the Texas 
Constitution, and that Crown has not established the factual predicate for 
applying Chapter 149 in this case. Id. at 535-540. Robinson makes the 
former argument in this Court, but we do not reach it.

[43] Id. at 
541.

[44] Id.

[45] Id. at 
549.

[46] Id. at 
550.

[47] Id.

[48] 251 S.W.3d at 550.

[49] Id. at 
551.

[50] 51 Tex. Sup. 
Ct. J. 292 (Jan. 11, 2008).

[51] Satterfield v. Crown Cork & Seal Co., 268 S.W.3d 190 (Tex. App.–Austin 2008, no 
pet.).

[52] The Robinsons 
also asserted a claim for conspiracy, but it was later nonsuited.

[53] Russell v. 
Ingersoll-Rand Co., 841 S.W.2d 343, 
345-346 (Tex. 1992) (“The survival action, as it is sometimes called, is wholly 
derivative of the decedent’s rights. The actionable wrong is that which the 
decedent suffered before his death. The damages recoverable are those which he 
himself sustained while he was alive and not any damages claimed independently 
by the survival action plaintiffs (except that funeral expenses may also be 
recovered if they were not awarded in a wrongful death action). Any recovery 
obtained flows to those who would have received it had he obtained it 
immediately prior to his death — that is, his heirs, legal representatives and 
estate. Defenses that could have been raised against a claim by the injured 
person may also be raised against the same claim asserted by the person’s heirs 
and estate. . . . Wrongful death actions are also derivative of the 
decedent’s rights.” (citing Tex. Civ. Prac. & Rem. Code 
§ 71.003(a) (“This subchapter [creating a wrongful death cause of action] 
applies only if the individual injured would have been entitled to bring an 
action for the injury if the individual had lived or had been born alive.”) 
(other citations omitted)).

[54] The following 
have submitted amicus curiae briefs in support of Crown: the State of Texas, 
Texas Civil Justice League, American Tort Reform Association, National 
Federation of Independent Business Legal Foundation, Chamber of Commerce of the 
United States of America, National Association of Manufacturers, Property 
Casualty Insurers Association of America, American Chemistry Council, National 
Association of Mutual Insurance Companies, 3M Company, Texans for Lawsuit 
Reform, and Product Liability Advisory Council, Inc.

[55] 511 U.S. 244, 
265 (1994) (quoting Kaiser Aluminum & Chem. Corp. v. Bonjorno, 494 U.S. 827, 855 (1990) (Scalia, J., 
concurring)).

[56] Kaiser, 494 
U.S. at 855-856 (Scalia, J., concurring) (citations omitted).

[57] Landgraf, 511 U.S. at 266; see also U.S. Const. art. I, 
§ 9, cl. 3 (“No Bill of Attainder or ex post facto Law shall be passed.”); 
id. art. I, § 10, cl. 1 (“No State 
shall . . . pass any Bill of Attainder, ex post facto Law, or Law 
impairing the Obligation of Contracts . . . .”); U.S. Trust 
Co. of N.Y. v. N.J., 431 U.S. 1, 17 n.13 (1977) (“The Due Process Clause of 
the Fourteenth Amendment generally does not prohibit retrospective civil 
legislation, unless the consequences are particularly harsh and oppressive.” 
(internal quotation marks omitted)).

[58] Landgraf, 511 U.S. at 266.

[59] United 
States v. Brown, 381 U.S. 437, 441 
(1965).

[60] Id. at 
442.

[61] Calder v. Bull, 
3 U.S. (3 Dall.) 386, 390 
(1798).

[62] Trs. 
of Dartmouth Coll. v. Woodward, 17 U.S. 
(4 Wheat.) 518, 628-629 (1819); see U.S. Trust Co. of N.Y. v. 
N.J., 431 U.S. 1, 21 (1977) (“Although the Contract Clause appears literally 
to proscribe ‘any’ impairment, . . . ‘the prohibition is not an 
absolute one and is not to be read with literal exactness like a mathematical 
formula.’” (quoting Home Bldg. & Loan Ass’n v. 
Blaisdell, 290 U.S. 398, 428 
(1934))).

[63] Tex. Const. 
art. I, § 16 (“No bill 
of attainder, ex post facto law, retroactive law, or any law impairing the 
obligation of contracts shall be made.”); Tex. Const. of 1869, art. I, § 14 (“No bill of 
attainder, ex post facto law, retroactive law, or any law impairing the 
obligation of contracts, shall be made; . . . nor shall any law be 
passed depriving a party of any remedy for the enforcement of a contract, which 
existed when the contract was made.”); Tex. Const. of 1866, art. I, § 14 (“No bill of 
attainder, ex post facto law, retroactive law, or any law impairing the 
obligation of contracts, shall be made . . . .”); Tex. Const. of 1861, art. I, § 
14 (same); Tex. Const. of 1845, art. I, 
§ 14 (same); Repub. Tex. Const. of 1836, Dec. of Rights 
§ 16 (“No retrospective or ex post facto law, or laws impairing the 
obligations of contracts shall be made.”). In the 1845 Constitutional 
Convention, the prohibition against retrospective laws was omitted from the 
first draft of the Bill of Rights, Journal of the Constitutional Convention of 
Texas 34 (1845), but one against retroactive laws was inserted just 
before final passage by floor amendment by Thomas Jefferson Rusk, formerly Chief 
Justice of the Supreme Court of Texas, id. at 
264.

[64] 13 The Oxford 
English Dictionary 796 (2d ed.1989).

[65] Id. at 
801.

[66] 4 Tex. 470, 475-476 (1849).

[67] Tex. Water 
Rights Comm’n v. Wright, 464 S.W.2d 642, 648 (Tex. 1971); accord 
Subaru of America, Inc. v. David McDavid Nissan, 
Inc., 84 S.W.3d 212, 219 (Tex. 2002) (“[N]ot all statutes that apply retroactively are 
constitutionally prohibited.”).

[68] Landgraf v. USI Film Prods., 511 U.S. 244, 265-266 (1994) (text and citations 
omitted).

[69] Id. at 
266.

[70] Id. at 267 n.20.

[71] Id. at 
267-268.

[72] 4 Tex. 470, 479 (1849).

[73] 22 F. Cas. 756, 767 (C.C.D.N.H. 1814) 
(No. 13,156); see Bryant Smith, Retroactive Laws and Vested 
Rights, 5 Tex. L. Rev. 231, 
233 n.9 (1927) (“Justice Story’s definition of a retroactive law is perhaps the 
one most frequently cited.”).

[74] Id. at 
768.

[75] DeCordova, 4 Tex. at 480 (citations omitted).

[76] 464 S.W.2d 642, 648-649 (Tex. 1971) (internal quotation 
marks omitted).

[77] 4 Tex. at 
480-482.

[78] Wright, 464 S.W.2d at 649.

[79] Id.

[80] 962 S.W.2d 489, 502 (Tex. 1997).

[81] 73 S.W.3d 244, 248-249 (Tex. 
2002).

[82] 997 S.W.2d 560, 573 (Tex. 1999).

[83] Id.

[84] The plaintiff 
sued on three promissory notes, all executed in 1840, and maturing in 1842, 
1843, and 1844, respectively. The statute of limitations was passed in 1841, and 
the plaintiff did not sue until 1849. DeCordova, 4 Tex. at 470-471.

[85] The 
plaintiffs held permits issued in 1918 and 1928, but they stopped pumping water 
in 1954. The forfeiture statute was enacted in 1957, and forfeiture was not 
sought until 1967. Wright, 464 S.W.2d at 
644.

[86] The plaintiff 
had seventeen months to sue before the statute was enacted and two months to sue 
after it was enacted and before it took effect. Likes, 962 S.W.2d at 502.

[87] Barshop v. Medina Cnty. 
Underground Water Conservation Dist., 925 S.W.2d 618, 634 (Tex. 
1996).

[88] Baker Hughes, Inc. v. Keco R. 
& D., Inc., 12 S.W.3d 1, 4 (Tex. 
1999).

[89] 3 S.W. 249, 253 (Tex. 1887).

[90] 115 U.S. 620, 628 (1885).

[91] Id. at 
629-630.

[92] 33 Tex. 745, 759-760 (1870).

[93] Mellinger, 3 S.W. at 252.

[94] 62 S.W.2d 490, 490 (Tex. 1933) (per curiam) (permission to file mandamus petition 
denied).

[95] 12 S.W.3d 1, 4 (Tex. 1999).

[96] 
Bender, 33 Tex. at 
759.

[97] Bryant Smith, Retroactive Laws and Vested Rights, 
5 Tex. L. 
Rev. 231, 231 (1927) (footnote 
omitted).

[98] Charles B. 
Hochman, The 
Supreme Court and the Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 692, 696 
(1960).

[99] 925 S.W.2d 618 (Tex. 1996).

[100] Act of May 30, 1993, 73d Leg., R.S., ch. 626, 1993 Tex. Gen. Laws 2350.

[101] Barshop, 
925 S.W.2d at 624.

[102] Id. at 
634.

[103] Id. at 
633.

[104] Id. at 
633-634.

[105] Id. at 634 
(quoting Act of May 30, 1993, 73d Leg., R.S., ch. 626, 
§ 1.01, 1993 Tex. Gen. Laws 2350, 2350-2351).

[106] Id. (quoting 
Act of May 30, 1993, 73d Leg., R.S., ch. 626, § 
1.06(a), 1993 Tex. Gen. Laws 2350, 2355).

[107] Barshop, 
925 S.W.2d at 634.

[108] 113 S.W.3d 355 (Tex. 2003).

[109] Id. at 356 
(quoting Tex. Fam Code 
§ 161.001(1)(Q)).

[110] Id. at 
360.

[11][1] Id. at 
361.

[112] Id. (quoting 
Barshop, 925 S.W.2d at 
633-634).

[113] Id. (quoting 
Tex. Fam. Code 
§ 153.001(a)(2)).

[114] A.V., 113 S.W.3d at 361.

[115] Id.

[116] Petitioner’s 
Reply Brief at 15.

[117] In re 
Chambless, 
257 S.W.3d 698, 700 (Tex. 2008) (citing Troxel v. Granville, 530 U.S. 57, 65 (2000) 
(plurality opinion)).

[118] Sw. Bell 
Tel. Co. v. Garza, 164 S.W.3d 607, 622 
(Tex. 2004) (quoting Wiley v. Spratlan, 543 
S.W.2d 349, 352 (Tex. 1976)).

[119] In re 
M.S., 115 S.W.3d 534, 547 (Tex. 2003) 
(quoting Santosky v. Kramer, 455 U.S. 
745, 758-759 (1982)).

[120] Tex. Const. 
art. XVI, § 59 (“The 
conservation and development of all of the natural resources of this State . . . [is] hereby declared [a] public right[] 
and dut[y]; and the Legislature shall pass all such 
laws as may be appropriate thereto.”).
 

[121] See Charles B. 
Hochman, The Supreme Court and the 
Constitutionality of Retroactive Legislation, 73 Harv. L. Rev. 692, 697 (1960) (“[T]he 
constitutionality of [a retroactive] statute is determined by three major 
factors, each of which must be weighed in any particular case. These factors 
are: the nature and strength of the public interest served by the statute, the 
extent to which the statute modifies or abrogates the asserted preenactment right, and the nature of the right which the 
statute alters.”); see also Owen Lumber Co. v. Chartrand, 73 P.3d 753, 755 (Kan. 2003); Peterson v. 
City of Minneapolis, 173 N.W.2d 353, 357 (Minn. 1969).

[122] Baker 
Hughes, Inc. v. Keco R. & D., Inc., 12 S.W.3d 1, 5 (Tex. 1999); Wilson v. Work, 62 
S.W.2d 490 (Tex. 1933) (per curiam) (original 
proceeding); Mellinger v. City of 
Houston, 3 S.W. 249, 254-255 (Tex. 1887).

[123] 251 S.W.3d 520, 532 (Tex. App.–Houston [14th Dist.] 
2006).

[124] Id.

[125] Hudson Cnty. 
Water Co. v. McCarter, 209 
U.S. 349, 355 (1908).

[126] 139 S.W.2d 257 (Tex. 1940).

[127] Owens Corning v. Carter, 997 S.W.2d 560, 573 (Tex. 1999).

[128] Graham v. Franco, 488 S.W.2d 390, 395 (Tex. 1972).

[129] Tex. Prop. Code 
§ 12.014.

[130] Act of May 
16, 2005, 79th Leg., R.S., ch. 97, § 1, 2005 Tex. Gen. 
Laws 169 (finding an “asbestos litigation crisis” in Texas and throughout the 
country).

[131] 15 Pa. Cons. 
Stat. Ann. § 1929.1 (West 
2010).

[132] Ieropoli v. AC&S Corp., 842 A.2d 919 (Pa. 2004).

[133] Fla. Stat. 
Ann. §§ 774.001-.008 (West 2010); 
Ind. Code Ann. §§ 34-31-8-1 to -12 (West 
2010); Wis. Stat. Ann. § 895.61 (West 
2010).

[134] N.D. Cent. Code § 32-46-06 (2010); Ohio Rev. Code Ann. § 2307.97 (West 2010); Okla. Stat. Ann. 
tit. 76, 
§§ 72-79 (West 2010).

[135] S.C. Code Ann. § 15-81-110 to -160 (2010).

[136] O.C.G.A. § 51-15-1 to -8 (2010) (see § 51-15-3, Chapter Note, 
Editor’s Notes, on effective date and non-codified provisions); Ga. L. 2007, p. 
4, §§ 2, 4 (text of SB 182, as passed, is available at 
http://www.legis.state.ga.us/legis/2007_08/fulltext/sb182.htm).

[137] Miss. Code 
Ann. § 79-33-1 to -11 
(2010).